Based on 13.32.40, United States of America v. Vinesh Darji, I'm here to ask you to please come to the side of David Oakley for the apology. May it please the Court, I'm David Oakley, counsel for Vinesh Darji. With me is my co-counsel, Leif Christman. I would like to reserve three minutes of my time for rebuttal. Fine. This is an appeal from a criminal conviction out of the Northern District of Ohio. So Mr. Vinesh Darji was convicted of distributing controlled substances. Mr. Darji is a licensed pharmacist. He had an internet business which was relying upon what was known in the industry as medical records based prescriptions. Every prescription that Mr. Darji filled had been written by a licensed physician. But he knew that these various doctors were writing unbelievable numbers of prescriptions, right? I would disagree with that point, Your Honor. Certainly because this was an internet business, there were large numbers of prescriptions being written. If you just look at the number of prescriptions being written, but when you consider the market area, it's not an unusual amount. The business model was designed to be convenient for people. Most of the prescriptions were for pain medications. The doctors in question would have medical records showing that a person could have a chronic pain condition. And so every month or every few months they need their prescription refilled, and it was up to the doctor to make sure. It wasn't one of the findings that these prescriptions were not, in fact, adequately supported by a real doctor-patient relationship. Well, there are two, and that gets to our first basically three issues of the appeal. There are two issues to look at here. With the standard of care placed on the physician, the prescription must be issued for a legitimate medical condition by a licensed practitioner in the usual course of their practice. Mr. Dargy, as a pharmacist, has a slightly different standard of care. He cannot knowingly issue a prescription that was not written within the usual course of practice. At trial, going to the element of Dargy's knowledge, the primary foundation for the whole case that the government had was that this business model of medical records-based prescription writing was fundamentally flawed because there was no face-to-face meeting between the doctor and the patient. Mr. Dargy looked into that issue and was able to determine that it was not, in fact, illegal at the time. It's not just that he had a mistake, but 60% of the jurisdictions, and that's a number I derived from the government's brief, 60% of the states had no rule against telephone consultations with the doctor to get a prescription. And the nature and structure of the Controlled Substances Act is such that Congress didn't want to impose, not being medical practitioners, they didn't want to impose their view of what is proper medical practice upon practitioners and the states. So they adopted the standard that I reviewed earlier, and it's basically set state-by-state by medical boards subject to Congress coming in and having authority to issue specific uniform rules if they choose to do so. In terms of a face-to-face consultation being required, Congress ultimately did choose to impose that standard because they didn't like the inconsistencies that the state had, and that is the Ryan Haight Online Pharmacy Act, which was not passed until after all of the conduct alleged in this complaint. Even though you say Congress imposed that standard, Mr. Dargy wasn't convicted because there was no face-to-face consultation. Your Honor, I would argue that that was the foundation of Dargy's knowledge. When you look at a lot of, you know, and admittedly I did not do the trial, and this is an extensive record, but when I look through the record and when I look through the citations that the government has cited in their brief, when they talk about things like Park Rover being one of the people that applied for a prescription for his excessive barking or Ron Burgundy being one of the doctors, these were not emails that Mr. Dargy had in his possession. I don't see any indication that he had those. That was U.S. Meds, and apparently one of the doctors there wasn't having, her office wasn't, was reviewing medical, was reviewing prescriptions, but she wasn't having doctors review those prescriptions. She had her sister and someone else who had, they weren't even registered nurses, who were doing the face, the phone consultations. Mr. Dargy didn't know about that. What was the foundation to argue that Mr. Dargy knew that these records were, that these prescriptions were issued outside of the usual course of medical practice? Looking through the record is that he knew they were not having face-to-face meetings, that he knew that patients were not in the same state as some of the doctors who were writing the prescriptions. But that knowledge that Mr. Dargy had was knowledge of a practice that was not illegal, and in our brief we cite Gonzales v. Oregon. That was a case where the Department of Justice, through an administrative rule, argued that assisted suicide medications are, per se, outside of the usual and customary course of medical practice. And the Supreme Court said that they can't make that determination by an administrative rule. If anyone would have to do it, it would have to be Congress, and obviously because of the Exposed Factor Law, that couldn't be retroactive. What the government did here is through an indictment. They made the practice of having a face-to-face meeting a requirement that did not exist, that 60% of jurisdictions, the states, allowed, and then they imposed that standard on Mr. Dargy through this indictment and through this jury verdict. And I can't certainly say that without that reference that other evidence isn't present, that Mr. Dargy possibly could have been convicted anyways. Because you're saying 60% of the states had no rule against telephone conversations, but that presumes then that 40% did have such a rule. I believe there were 40% that had some restrictions, some type of rule in place. Was there evidence then introduced at the trial that your client was issuing these medications to people from those 40% of the states? Or did he limit his sending prescriptions out to the 60% of the states that you say didn't prohibit this? I don't know on the record about patients in other states. What I do know is one of the main doctors, Dr. Fernandez, where she was, did not have that requirement, and Florida did not have that requirement. And I would give the analogy, if a patient lives in Ohio and they have a doctor in Kentucky because they're right on the border, if they go to Kentucky to get a prescription and they go to Kentucky for their doctor, what matters is where the doctor is, not where the patient ultimately resides. Here, instead of using a vehicle, they're using the Internet to contact a doctor. If the doctor who's writing the prescription, if it was within the accepted usual and customary course of the medical practice of the state where that doctor is, then it doesn't matter where the patient is. So were all of the doctors in states that allowed telephone communications with patients and no face-to-face visits? I believe so, Your Honor. Unfortunately, I do have to concede that this is a lengthy record and I didn't do the trial, so I can't say that with 100% certainty, but I do believe that is the case. There were doctors that were convicted in this. That's correct. If they were doing it legally in the states, why would they be convicted? Well, looking at some of the doctors as, for example, Dr. Fernandez, she had her sister, I believe, and another person who were making phone calls. She knew they weren't medical professionals. She knew they weren't doing that. And also a lot of the doctors, they knew they didn't actually have the medical records. But they are under a different standard because they're the ones actually writing the prescription. Mr. Dargy's standard is whether he knowingly filled those prescriptions or filled those prescriptions knowing that those doctors had issued them outside of the usual course of the medical practice. All Mr. Dargy knew was that there were no face-to-face meetings. These other doctors, they knew a lot more. They knew that they didn't have good medical records. They knew that they had people who weren't licensed medical professionals doing the consultations, but they weren't providing this information to Mr. Dargy. And, in fact, Mr. Dargy had an extensive practice of trying to follow up and determine if these doctors were, in fact, fulfilling their obligation, which is part of what he's required to do. But he has a duty to be vigilant. He doesn't have a duty to be perfect. If they are concealing from him that non-licensed medical professionals are doing the reviews or that they don't even actually have medical records when they say that they do, he doesn't know that, and that's the standard here. It's knowingly. And that is the problem with this face-to-face meeting. Mr. Dargy never denied that he knew these were telephone consultations. So by creating that as a legal standard for an automatic breach of the usual course of medical practice, Mr. Dargy, of course he knew that. He never denied he knew that. He contacted an attorney to determine whether or not that was illegal, and he got advice from an attorney that that wasn't illegal, that that particular aspect of the practice was not illegal. And I understand that there's more to it that the doctors were doing and that the records that they had. But in this particular case, for this particular defendant, we're looking at what Mr. Dargy knew. And the problematic part of the government's case of using this face-to-face meeting as an automatic violation or as a violation of the usual course of medical practice is they're letting a jury, as a matter of fact, decide what the legal standard is. And, of course, there's always questions where you have a mixed question of law and fact. Some are worse than others. I would say this is one of the most difficult and problematic ones in a way by design because Congress didn't want to impose a medical judgment across the board and wanted to let doctors have medical professionals be making these decisions. Here, many medical professionals were following this practice. Even one of the plaintiffs or the government's own experts had conceded following this practice. Based upon that, it's impossible to separate this face-to-face meeting requirement from the whole trial. There may have been sufficient other evidence, but this case should be reversed and remanded for a new trial. And I see that my time is up if there are no questions. Thank you. May I please court? My name is Dan Hurley, and I represent the United States. With respect to counsel, it's just not true that this case was about face-to-face. Mr. Dargy tried to make it about face-to-face. He tried to make it about face-to-face with each of the DEA investigators who came to speak to him. He made it about face-to-face when he talked to his lawyers.  The theory from start to finish was that this was a breach of the standard of whether these prescriptions were issued in the usual course of medical practice, whether they're issued for a legitimate medical purpose. And there's evidence in the record that was the theory in the T3 affidavits. That's in the indictment. If you looked at page 5 of the indictment, the second paragraph, which is laying out the government's theory of the case, it specifically says the consultations were cursory in nature, did not involve the exercise of medical judgment. How does he know that? He has an obligation to know that, Your Honor, because the way the statute's written, 841 says you cannot distribute these, and then there's the exemption for practitioners, doctors, and pharmacists. And under the law, he has an affirmative obligation to satisfy himself that these prescriptions were issued for a legitimate medical purpose. The government had a mountain of evidence that put him on notice that these were not issued for a legitimate medical purpose. We're not asking Mr. Dargy to second-guess their judgment. Is the pain severe enough? Is this the right dosage? What Mr. Dargy knew was that Dora Fernandez was a psychiatrist in Puerto Rico, and he knew that, he admitted knowing that. And she was writing somewhere in the neighborhood of 680 prescriptions a week that were filled at his pharmacy. Now, he doesn't know whether she has other prescriptions being written, but he admitted on cross that he filled 684 prescriptions in one week in January, all for hydrocodone. If that doesn't put him on notice that she's not forming a relationship with these patients by the phone, by the Internet, however, you can't form a legitimate medical relationship with 684 people in a week. You can't exercise medical judgment. He knew that he was getting paid. If she wouldn't have to form a new relationship with the patients, because you're a counsel for the plaintiff says that, you know, people who have these pain conditions, you know, it's pain management over time, so it could be a number of these who are customers where there's not a requirement to form a new relationship, couldn't it? I disagree, Your Honor. If they're not her patients, if they're her patients originally, perhaps, but she's not in the business of pain clinics. There are special categories of doctors who have slightly different standards under the medical rules for what their standards are. These are people, these sites, they did not allow refills because then they didn't get the extra fee. Mr. Dargy knew he was getting paid somewhere in the neighborhood of 20 to 40 times his normal fill fee. When you're getting paid that much for a controlled substance like hydrocodone, that's a red flag. You need to ask yourself, why are they paying me 20 bucks a prescription when Walgreens will only give me 50 cents? Mr. Dargy was trying to really rely on willful ignorance, which is not permitted under the law. That's exactly right, Your Honor. And there were not just the 684 people a week from one doctor who's outside her area of training, who's issuing nothing but hydrocodone prescriptions from Puerto Rico for patients all over the country. He knows that they're paying him far more than they should. He knows the patients are paying $200 to $300 when if they had a real pain management issue that was being overseen by a doctor with a sufficient relationship, they could go get it for 20 bucks from Walgreens or Rite Aid or wherever. The patients were paying him $200 to $300? No. How did that work? They're paying U.S. meds. They go to the website. They select the drug. They select the dosage. They select the quantity. It goes through the system. The physician then either says, I approve or I disapprove. There isn't even an option for the physicians to say that's too much, lower dose, we need to wean you off, et cetera. That then gets referred to Dargie and he fills it. U.S. meds pays Dargie $20 per prescription. And they reimburse his shipping. He gets from Walgreens 50 cents to $2 for these same prescriptions. The patients pay or the customers pay U.S. meds, and there was evidence Dargie was aware of this, $200 to $300 per prescription depending on when it was filled. The testimony was they could get the drugs from Walgreens for 20 bucks. This reflects my ignorance. Who's paying the manufacturers of the hydrocodone? Dargie. Dargie does? Dargie does. So is it $20 that he gets to fill it? Actually, there was evidence that he was reimbursed for the cost of his goods as well. Reimbursed for the cost? Yes. And is that typical of pharmacies? I'm asking is there evidence in the record. Of course not. As I understand the record, the pharmacy gets a fill fee  Here the evidence showed Dargie both got his cost of goods reimbursed, he got his shipping reimbursed, and then he got $20 per prescription, whereas in the industry the standard was between 50 cents and $2 and something as a fill fee. Dargie got $20 as a fill fee for each prescription that he filled, just putting the pills in the bottle and shipping it out. He got $20 per prescription when normally they would get 50 cents, 75 cents, a dollar, whatever. Dargie also knew that almost all these prescriptions were for hydrocodone. Dargie knew that some of these prescriptions, when they moved to what they called the 50-50 plan, this is when there was a crackdown and some of the pharmacies were getting a lot of heat from their suppliers because they were dealing in such astronomical quantities of hydrocodone and everybody knew at the time there's a lot of abuse going on. These are addicts who are getting these pills. This is not legitimate medicine. These are addicts getting these pills. They came up with a 50-50 plan. They said we'll include a prescription for a non-controlled substance so the ratio looks better, so it doesn't make it as obvious that they're just writing script after script after script. Are there any regulations on the pharmaceutical companies that are manufacturing the drug or do they have to meet any standards or can they just dole them out? I mean, they've got a big lobbying group, I guess, and they go to Congress and exempt themselves from... They're not exempt, Your Honor, and in fact they have some of these same obligations and there was testimony in the record that the suppliers of Mr. Darugy were being shut down and that is why some of these issues came up. There are references throughout, there are phone calls between Hazelwood, who managed the website, and Revito, who managed the process and the doctors, and Darugy was in the loop of some of this, that the suppliers were shutting down supply because DEA was coming to them and saying, you're not going to be allowed to do this if you engage in these practices or you're not meeting your obligation to make sure that this isn't abused. Wholesalers or manufacturers or both? Both are subject. Everyone in this chain is subject to these provisions as a general matter. They're not all subject to the exemption that applies to practitioners, meaning doctors and pharmacists, but the testimony was these rules, because these substances are so addictive, they apply from maker to taker. Is there anything in the record about how much money Darugy was making over the course of some period? My recollection, it was somewhere in the neighborhood of a million dollars that Darugy got from filling these. You could just take the number in the government's exhibit, I think it's 701. What period of time was that? Do you know? It's about a year and a half, but as you may recall, he stopped filling for a period of time. So he filled, then he stopped, then he filled again. So the total span is, I think, about a year and a half. It was from late 2005, and then he stopped, and then he picked up again. But Darugy knew, back to the 50-50 plan, Darugy knew that these prescriptions were now coming in saying hydrocodone and a non-controlled pain reliever. Darugy knew the only purpose for that prescription was to provide cover for the volume or quantity of hydrocodone prescriptions. Darugy knows that's not a legitimate medical purpose. That prescription, that combination of prescriptions, is not being issued by a doctor who thinks, in my medical judgment, this person needs these medicines. Darugy knew this was so that they would have cover to get more hydrocodone. But why does he know that as opposed to thinking that a patient might benefit from a non-addictive plus an addictive pain reliever? Hazelwood testified that he and Darugy, and Liddy was the other pharmacy that did a lot of the filling in this case. There were conversations between Darugy and Hazelwood about this plan. The record's clear that Darugy knew that there was this 50-50 plan, and then Darugy began filling these prescriptions, which included the controlled substance of hydrocodone and the non-controlled but still prescription required. Darugy knew those prescriptions are invalid. He knows that those are not the exercise of medical judgment, and yet he kept filling. I would suggest no one of these is dispositive, but when you have his exorbitant pay, the prices that are being paid, the volume that's being written, the number of patients that doctors are seeing, the fact that they're almost all for hydrocodone, the fact that there's a 50-50 plan, when you put them together, is he on notice that these are not being written for legitimate medical purposes? The answer is, of course he is. He has to be. And Darugy wants to only talk about face-to-face, but that's not the issue here. The government has never said it's closing argument conceded. It's not about face-to-face. It's about under the regulation and under the statute, is this medicine or is this pushing pills? That's what this is about. And the combination of these factors, Darugy had an obligation to assure himself that it was about medicine. The standard is not, does he know it's not medicine, because he's under these rules, he has what's called the corresponding responsibility. He has to satisfy himself, this is the practices of medicine. This is a legitimate medical purpose in the judgment of a doctor acting in the usual course of practice. And each of these factors together show him that's not what's going on. You can't exercise medical judgment as to 684 people in a week. And if they're paying you 20 to 40 times what you would pay at the corner pharmacy, then that's a pretty strong sign these are addicts getting their meds. Could a doctor legitimately use paramedical professionals to do the telephone screening of patients? They can play a role, but at the end of the day, the prescription has to be based on the doctor's medical judgment. And so we're not saying that if anyone else in the room, when you go to the doctor, you first meet with the nurse, the physician's assistant. So it's not the fact that others are involved, but at the end of the day, it's Doris Fernandez's prescription, and she's writing that prescription. That's a representation in her judgment, this person needs this. So could she, this doctor, legitimately have a physician assistant do all the interaction with the patient, and then the doctor just look at the medical record and say yes? If the doctor is sufficiently informed about the patient, the patient's condition, if the doctor is forming that relationship, and this is where the testimony of Dr. Nelson was that there still needs to be some doctor-patient relationship. The doctor can't just outsource it all to the physician's assistant. The doctor has to be exercising medical judgment. 684 people in a week, no matter how efficient the... Well, it's 100 people a day is what it is. If you work 7 days, some of us do. And so 100 patients a day, if you're just reviewing records and you work 10 hours, that's 10 patients an hour. I realize this is a very lengthy workday that I'm hypothesizing here. Well, I mean, the issue is can they do that one day? Sure. The next day, maybe, but they're probably getting pretty tired. But by the third week, by the fourth month, then I don't think they can be exercising sufficient medical judgment to do this day after day after day. And this case isn't about any particular prescription or any particular week. It's about this is the whole setup here. And Dargie did have sufficient notice, and he admitted he knew. Dargie claims to have reviewed some of these records and found that these records were totally invalid. They were either false, they were totally inadequate. Well, if you're a pharmacist and you get hundreds of prescriptions all for hydrocodone for people all over the country, and you see these records are no good, you can't fill the next 100 hydrocodone prescriptions. You have an obligation to see this isn't medicine. This is pill-pushing. How large a problem is this throughout the country? Are there lots and lots of these cases being brought by the department? There are fewer. I see that my time is up. The court's indulgence. The Internet problem is not as great because the Ryan Hate Act made it easier for the government to just say, de facto, this is no good, whereas before we had to prove, as we did here, there is no legitimate medical purpose, et cetera. This is still a substantial issue throughout the country, and in fact there's evidence that the hydrocodone addictions are actually causing a substantial heroin problem because heroin is actually much cheaper and easier to get nowadays than the hydrocodone is. And so all the hydrocodone addicts are now becoming heroin addicts because of that. I see that my time is up. Thank you, Your Honor. The attorney for the government pointed out that no one issue here is dispositive. In the first part I talked a lot about the face-to-face meeting. I'm going to go over a few of these other things. The attorney for the government talked about the number of prescriptions being issued, and as Judge Moore correctly pointed out, it is certainly possible for a doctor who's working hard to issue this number of prescriptions. The question here isn't whether or not Dr. Fernandez was fulfilling her duties. I've looked through the record. It would appear fairly clear in the case against her that she wasn't, but that's not the case for Mr. Dargy. Mr. Dargy is charged with having knowledge that she wasn't doing her job properly. The fact that it is possible for a company to have been issuing this number of prescriptions in a day certainly does require a duty of diligence, and Mr. Dargy exercised that duty of diligence. He had a procedure in place, and in fact the government tries to use it against him in several here today and at trial. They talk about how he found out that there were some false prescriptions or there were bad prescriptions or where the medical records didn't back up the prescriptions. And when he found those, he didn't issue those prescriptions. And a lot of the e-mails that are cited that don't involve Mr. Dargy, between Mr. Rivedo and I forget the other individual's names, but from U.S. Meds, they're talking about how they're always trying to improve their medical record retention policy and their medical records, what they have. The government says that that's window dressing. Well, who's that window dressing for? That's window dressing for the pharmacists. They are providing this information to the pharmacists. They're telling them, we have medical records. This is all based upon our usual and customary practice. Mr. Dargy is a pharmacist. He's not a doctor. He doesn't know what medications go together. He is entitled to trust with reasonable inquiry, but he's still entitled to trust what a physician writes. And Dr. Fernandez was a licensed physician. Additionally, Mr. Dargy was completely up front throughout his operation in this business. He had his Florida pharmaceutical license renewed. He did stop briefly because the DEA had told him that they had questions about his practice. He consulted an attorney. And upon his review, what was required was a bona fide relationship, which his review satisfied him was sufficient. Now, it turns out, it would seem, looking at the record, that a lot of these prescriptions weren't issued in the usual and customary course of the medical practice. But what the evidence doesn't show is that Mr. Dargy knew that or that even though his due diligence may have not been perfect, that it was not sufficient. And I see that my time is up, so unless there are questions, I'm done. Thank you. Thank you both for the argument. And Mr. Oakley, I see that you're appointed pursuant to the Criminal Justice Act, and we thank you for your representation of your client in the interest of justice. Pleasure to be here, Judge. Would the clerk call any remaining cases? Are there any remaining cases? There are a few. Thank you. Case number 13-3525, United States of America v. Audrey Beto. Case number 14-1606, Biola Chambers v. H. S. C. Banks and others. Case number W. Thank you. We do adjourn court. Thank you. This is all recorded now. Thank you.